IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK GILSON** *et al.*,<br>*Plaintiffs* | : | CIVIL ACTION |
| v. | : | No. 20-758 |
| **CITY OF PHILADELPHIA** *et al.*,<br>*Defendants* | : | FILED UNDER SEAL |

### MEMORANDUM

PRATTER, J.                                                                                                                            OCTOBER 26th, 2021

Mark Gilson and Marc Costanzo contend that the City of Philadelphia's District Attorney's Office, led by District Attorney Lawrence Krasner, unlawfully terminated their employment based on their age. The City and Mr. Krasner filed a motion for summary judgment, claiming that Mr. Gilson and Mr. Costanzo cannot show that Mr. Krasner's reasons for terminating their employment were a pretext for discrimination. However, Mr. Gilson and Mr. Costanzo have presented evidence to establish a genuine dispute on this point. Thus, summary judgment must be denied.

#### BACKGROUND

Lawrence Krasner was elected as the Philadelphia County District Attorney in November 2017 and took office in January 2018. During his first week in office, Mr. Krasner sought the resignation of 30 District Attorney's Office attorneys. Mark Gilson and Marc Costanzo were two of these attorneys.

Mr. Gilson became an assistant district attorney in 1987, holding several different positions throughout his tenure. He was promoted to the Office's Homicide Unit in early 1992 and remained in this unit as a prosecutor until early 2010. Mr. Gilson also held several supervisory positions, including as Director of the Conviction Review Unit for nearly three years. In January 2017, he was reassigned to the Insurance Fraud Unit where he remained until his January 2018 discharge.

1

Mr. Costanzo also joined the District Attorney's Office as a prosecutor in 1987. He held several positions and was promoted to the Homicide Unit. In 1993, Mr. Costanzo left to join the Pennsylvania Attorney General's Office, where he worked until returning to the District Attorney's Office in January 2013. Upon his return, he first worked in the Insurance Fraud Unit and was then transferred to the Special Investigations Unit. He served as Chief of the Special Investigations Unit from October 2013 until December 2016, when he was assigned to the Appeals Unit.

Both Mr. Gilson and Mr. Costanzo were 58 years old when Mr. Krasner took office. The letter informing Mr. Gilson and Mr. Costanzo of Mr. Krasner's decision did not provide any reason for the terminations. In his response to complaints filed by Mr. Gilson and Mr. Costanzo with the Pennsylvania Human Relations Commission (PHRC), Mr. Krasner stated that he "had been able to conduct what essentially amounted to a thirty-year job interview" of those whose employment was terminated including "extensive opportunities to observe and assess their professional competence, demeanor, and ethics." Doc. No. 27-6 ¶ 2. Mr. Krasner did not review either Mr. Gilson's or Mr. Costanzo's personnel file "because he did not have confidence that the files contained complete, reliable, or helpful information." Doc. No. 23-6 ¶ 7. He "also did not seek formal input from supervisors in the outgoing administration, or talk to those employees he was considering for termination, because he viewed the office as 'tribal' and overly 'self-protective.'" *Id.* ¶ 8.

In response to Mr. Gilson's interrogatories in this case, Mr. Krasner stated that he terminated Mr. Gilson's employment because he viewed Mr. Gilson as an "overly aggressive" prosecutor who "did not recognize or care about Brady violations" and lacked commitment to pursuing justice and freeing innocent people during his time in the Conviction Review Unit. Doc. No. 23-8, Def.'s Ex. K, at 1–2. Then, in his deposition, Mr. Krasner testified that he terminated

2

Mr. Gilson's employment based on a "very significant" experience where Mr. Gilson, according to Mr. Krasner, improperly served him with a Grand Jury subpoena in connection with a discovery motion in a homicide case and then poked him in the chest "demanding to know" Mr. Krasner's source. Doc. No. 23-6 ¶ 25; Doc. No. 23-7, Def.'s Ex. G, Tr. at 196:23–197:7. Mr. Krasner also testified that his "personal experience" with Mr. Gilson and Mr. Gilson's operation of the Conviction Review Unit as a "conviction rubber stamp unit" were dispositive factors "above all else" in his decision to terminate Mr. Gilson's employment. Doc. No. 23-6 ¶ 32.

In response to Mr. Costanzo's interrogatories, Mr. Krasner stated that he terminated Mr. Costanzo's employment based on a negative view of his "sense of fairness and commitment to due process" from knowing Mr. Costanzo for "slightly over 30 years" and handling cases against him. Doc. No. 23-8, Def.'s Ex. R, at 77–78. Mr. Krasner also stated that he disapproved of how Mr. Costanzo handled police accountability cases. In his deposition, Mr. Krasner testified that he based his termination decision on Mr. Costanzo's reputation as "a bully." Doc. No. 23-6 ¶ 52. Specifically, Mr. Krasner recounted Mr. Costanzo referring to a judge who allegedly bullied Mr. Krasner in front of Mr. Costanzo as an "American Hero" and stated that he consulted with an advisor, Michael Giampietro, about Mr. Costanzo's reputation. *Id.* ¶¶ 50–51; Doc. No. 23-7, Def.'s Ex. G, Tr. at 168:11-169:4. Mr. Krasner again testified that he viewed Mr. Costanzo's role in the Special Investigations Unit as responsible for a lack of "evenhanded accountability for police officers." Doc. No. 23-6 ¶ 53.

During Mr. Krasner's political campaign for District Attorney, he reportedly made several comments in media interviews about his approach to personnel decisions if elected District Attorney. Mr. Krasner stated that "people who are going to be made to leave . . . will tend to be my generation, people who started in this business 30 years ago." Doc. No. 23-8, at 89. Mr.

3

Krasner also stated that the "old guard . . . needs to go", Doc. No. 23-8, at 97, and that "what we are going to see is broad support among a lot of younger ADA's, but we are going to see that there are some people in there whose vision for a DA's Office is so entrenched that they are unwilling to embrace a new one" who "will be better served working somewhere else", *id.* at 99–100.

Mr. Gilson and Mr. Costanzo brought age discrimination claims under the Age Discrimination in Employment Act ("ADEA") and the Philadelphia Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA"). The City of Philadelphia and Mr. Krasner then moved for summary judgment on all claims.

## LEGAL STANDARDS

### I. Summary Judgment

A court can grant a motion for summary judgment if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.* "Under Rule 56, the Court must view the facts and all reasonable inferences in the light most favorable to the non-moving party." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 384 (E.D. Pa. 2013). But "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 888–89 (E.D. Pa. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## II. Age Discrimination

The ADEA prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Likewise, the PHRA prohibits an employer from discriminating on the basis of age. 43 Pa. Stat. § 955(a). A plaintiff bringing an age discrimination claim "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

Courts in the Third Circuit analyze claims brought under the ADEA and PHRA using the same burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) ("[T]he interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA"); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (approving "continued application of the *McDonnell Douglas* paradigm in age discrimination cases"). The *McDonnell Douglas* framework proceeds in three steps. The plaintiff faces the initial burden to establish a prima facie case of discrimination. Then, if a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is offered, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were "not its true

5

reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

At the summary judgment stage, the Court must draw factual inferences in the non-moving parties' favor. *See Doe v. CARS Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). Summary judgment should "be used sparingly in employment discrimination cases," particularly "when . . . intent is at issue." *Id.* at 369; *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). To survive at the summary judgment stage, a non-movant need only show that "sufficient evidence support[s] the claimed factual dispute" and a judge or jury must resolve "the parties' differing versions of the truth" at trial. *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 288–89 (1968).

## DISCUSSION

The City and Mr. Krasner do not dispute, for the purposes of summary judgment, that both Mr. Gilson and Mr. Costanzo have established a prima facie case of age discrimination. Instead, they argue that Mr. Krasner acted on legitimate, non-discriminatory motives. In order to defeat summary judgment when an employer asserts a non-discriminatory reason for its action, the burden shifts back to the aggrieved employee to identify "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). That is, a plaintiff must introduce evidence showing that the proffered reason "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* However, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken,

6

since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765.

Mr. Gilson and Mr. Costanzo each contend that Mr. Krasner's proffered justifications are mere pretext and raise disputed issues of fact. Evidence of pretext can include "inconsistencies and implausibilities in the employer's proffered reasons for [the termination] which *could* support an inference that the employer did not act for nondiscriminatory reasons." *Sorba v. Pa. Drilling Co.*, 821 F.2d 200, 205 (3d Cir. 1987). When a plaintiff shows that the reasons given for termination were not consistent throughout the proceedings, "this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001). In considering the broader context, the Court must determine whether such "evidence contradict[s] the *core facts* put forward by the employer as the legitimate reason for its decision" such that a reasonable jury could infer that the employer did not act for the non-discriminatory reason provided. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006).

For the reasons set forth below, the Court finds that material factual disputes preclude summary judgment on both sets of claims.

I.      **Mr. Gilson's Claims**

Mr. Gilson argues that inconsistencies and disputes about "core facts" in explanations proffered by Mr. Krasner support an inference that the purported non-discriminatory reasons are pretext. Mr. Krasner and the City argue that having multiple reasons to terminate someone's employment is not evidence of pretext and that Mr. Krasner simply "provide[d] further details in support of [his] previously-stated rationale." Doc. No. 28, at 8. The City and Mr. Krasner attempt to distinguish the pretext cases cited by Mr. Gilson as cases involving a "wholesale change in the

7

primary rationale for the employer's decision." *Id.* at 9. Thus, the Court begins by analyzing the termination justifications raised by Mr. Krasner and the City.

First, the abrupt resignation request provided no reason for the termination. Then, in Mr. Krasner's response to Mr. Gilson's PHRC complaint, Mr. Krasner stated that he fired Mr. Gilson after a "thirty-year job interview" based on their court experience together. Doc. No. 27-6, Pl.'s Ex. 4 ¶ 2. Mr. Gilson disputes this characterization, pointing out that he and Mr. Krasner had "no professional or personal interaction . . . from 1987 to 2018" aside from minor interactions in May 2002 and May 2003. Doc. No. 27-1 Resp. ¶ 22(b).

After this litigation commenced, Mr. Krasner stated in his interrogatory responses that he terminated Mr. Gilson's employment due to his reputation as a bully and unsatisfactory leadership of the Conviction Review Unit. Mr. Gilson disputes Mr. Krasner's criticism that the Conviction Review Unit secured "only" one exoneration under Mr. Gilson's leadership. Specifically, Mr. Gilson argues that it was widely known that his unit was understaffed—he was the sole employee—and that one exoneration "compared favorably with those of conviction review units that were established in 2014 by other major cities." Doc. No. 27-1 Resp. ¶ 29(b). While Mr. Krasner is certainly permitted to act on a personal, even if unfair or erroneous, view of the Conviction Review Unit's success or failure, *see Fuentes*, 32 F.3d at 765, Mr. Gilson argues that he has disputed core facts that call Mr. Krasner's credibility into question. For example, Mr. Gilson argues that a news article about the Conviction Review Unit on which Mr. Krasner testified he relied for his view of Mr. Gilson's work emphasizes the understaffing issue. Doc. No. 23-8, at 12–13, 17 (describing Mr. Gilson's unit as a "one-man unit" compared to more successful units with five or more attorneys and investigators). Moreover, Mr. Krasner's own comments included his opinion that the unit would need "ample resources to carry out their work." Doc. No. 27-1

8

¶ 29. Mr. Gilson had also been working at the Insurance Fraud Unit, rather than the Conviction Review Unit, for about a year when Mr. Krasner sought his resignation.

Then, in his deposition several months after the interrogatory responses, Mr. Krasner for the first time raised the alleged Grand Jury subpoena and chest-poking incident as "very significant" factors in his decision to terminate Mr. Gilson's employment. Doc. No. 23-6 ¶ 25; Doc. No. 23-7, Def.'s Ex. G, Tr. at 196:23–197:7. Mr. Gilson argues that these allegedly "very significant" reasons were not raised at the time of the resignation request, in the PHRC statement, or in Mr. Krasner's interrogatory responses. Mr. Gilson also disputes that either event ever happened, testifying that he never served Mr. Krasner with a Grand Jury subpoena and that he never poked Mr. Krasner in the chest.

Mr. Gilson further argues that, at his deposition, Mr. Krasner could not "recall the name of his client in the alleged Grand Jury matter, the year or even the decade when the incident allegedly took place, or if the subpoena was issued by a judge." *Id.* Mr. Krasner and the City admit that Mr. Krasner "has been unable to recall the name of the defendant or other details regarding this case which was one of thousands he handled a decade or more ago." Doc. No. 23-6 ¶ 26. Mr. Krasner introduces the testimony of Arun Prabhakaran, his former Chief of Staff, to support his account of the Grand Jury subpoena allegation. Mr. Prabhakaran stated that Mr. Krasner told him about a Grand Jury subpoena incident involving an unknown assistant district attorney that happened "when he was working as a public defender." Doc. No. 23-6 ¶ 36. Mr. Gilson counters that Mr. Prabhakaran's testimony actually contradicts Mr. Krasner's allegation. Mr. Krasner testified that the incident occurred in connection with a homicide case. But Mr. Krasner also testified that he (1) did not try or handle homicide cases as a public defender in Philadelphia and (2) did not handle cases with Mr. Gilson as a federal public defender. Thus, it is unclear when a homicide case between Mr. Gilson and Mr. Krasner as a public defender could have ever taken place. These disputes raise

9

additional questions about Mr. Krasner's credibility. Such questions, of course, open the door for more than the passing possibility that Mr. Gilson's age was a "very significant" reason for his discharge.

"When the defendant's intent has been called into question, the matter is within the sole province of the factfinder." *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989). The "honesty or legitimacy" of the employer's narrative is a "core fact[]" in determining whether a plaintiff has asserted sufficient evidence of pretext to survive summary judgment. *West v. Northampton Clinic Co., LLC*, 783 F. App'x 118, 123 (3d Cir. 2019). Because Mr. Krasner has himself invoked shifting reasons for his decision, and Mr. Gilson disputes core facts to undermine the credibility of these reasons, the issue of Mr. Krasner's intent in terminating Mr. Gilson's employment is a factual dispute for the jury.

## II.    Mr. Costanzo's Claims

Mr. Costanzo similarly argues that inconsistencies and disputes about "core facts" support an inference that Mr. Krasner's purported non-discriminatory reasons for his termination decision are pretext. As with Mr. Gilson, the City and Mr. Krasner argue that additional detail and a variety of reasons do not establish inconsistencies.

The resignation letter received by Mr. Costanzo also did not provide a reason for the termination decision and Mr. Krasner's PHRC statement similarly echoed a "thirty-year job interview" as the basis for his decision. Doc. No. 27-20, Pl.'s Ex. 20 ¶ 2. Then, in response to Mr. Costanzo's interrogatories, Mr. Krasner stated that he based opinion of Mr. Costanzo's reputation on knowing Mr. Costanzo "for slightly over 30 years and handl[ing] cases against him." Doc. No. 23-8, Def.'s Ex. R, at 77 ¶ 2. In his summary judgment briefing, Mr. Krasner maintains that he "has known Mr. Costanzo for over thirty years and recalls handling cases where Mr. Costanzo was the prosecutor in the late 1980s/early 1990s." Doc. No. 23-6 ¶ 49. Mr. Costanzo disputes this. Mr. Costanzo testified that he does not recall trying any cases involving Mr. Krasner

in the late 1980s or early 1990s and argues that Mr. Krasner testified that he could not recall the names of any such cases. Mr. Costanzo also testified that he has had no contact with Mr. Krasner since that long ago time period.

In Mr. Krasner's interrogatory responses and deposition testimony, he also stated that he based his decision on Mr. Costanzo's police accountability work as chief of the Special Investigations Unit. As with Mr. Gilson, Mr. Costanzo no longer held this leadership role at the time of his termination; he had transferred to the Appeals Unit in December 2016.[1] The parties dispute whether Mr. Costanzo effectively held police officers accountable in the Special Investigations Unit. While the ultimate accuracy of Mr. Krasner's opinion is not the relevant issue, a plaintiff may demonstrate pretext by introducing evidence showing that the proffered reason was a *post hoc* justification that did not actually motivate the termination. *Fuentes*, 32 F.3d at 764. Mr. Costanzo presents the testimony of his supervisor, Ann Ponterio, who recalled several instances where Mr. Costanzo pursued investigations even when other District Attorney's Office officials objected and Mr. Costanzo was "unwilling to allow police officers to escape responsibility for illegal conduct." Doc. No. 27-5 ¶ 22.

Then, for the first time at his deposition, Mr. Krasner alleged that he based his opinion on conversations with his advisor, Mr. Giampietro, and that he "may have" also spoken with a lawyer named Stu Lev. Doc. No. 23-7, Def.'s Ex. G, Tr. at 168:11–169:4. However, Mr. Giampietro testified that he does not recall discussing Mr. Costanzo with Mr. Krasner prior to the January 5, 2018 terminations.

In his deposition, Mr. Krasner also stated for the first time that his opinion of Mr. Costanzo was based on interactions with a judge who allegedly bullied Mr. Krasner in front of Mr. Costanzo

---

[1] However, Mr. Costanzo did continue to handle special investigations after this transfer.

11

at some time between 1989 and 1991. Mr. Krasner stated that Mr. Costanzo did not "speak up against or do anything against the nonsense that was going on in that courtroom" and that Mr. Costanzo remarked that the judge was an "American hero." Doc. No. 23-7, Def.'s Ex. G, Tr. at at 136:15–140:7; 142:9–12. Mr. Costanzo testified that it's "very possible" he referred to the judge using this phrase because the judge was a decorated World War II veteran, but argues that Mr. Krasner similarly did not report any of the judge's alleged behavior. Doc. No. 27-1 Resp. ¶¶ 51(b)–(c). Apparently there is no record of Mr. Krasner seeking protection or relief from the "bullying" or Mr. Costanzo's alleged failure to give him a professional shield.

Discrepancies in Mr. Krasner's justification for his decision to terminate Mr. Costanzo's employment preclude summary judgment. Mr. Krasner testified that he relied on Mr. Giampietro's assessment of Mr. Costanzo, but Mr. Giampietro testified that he did not discuss Mr. Costanzo with Mr. Krasner. Despite continuously maintaining that he has known Mr. Costanzo for over 30 years and tried cases against him, Mr. Krasner did not raise the issue involving the abusive judge until his deposition testimony and offers no other support for assertion that he handled cases involving Mr. Costanzo. Because these discrepancies involve Mr. Krasner's intent and whether his non-discriminatory justifications are pretext, there are disputes of material fact that must be resolved by a jury.

### III. Mr. Krasner's Comments

Mr. Gilson and Mr. Costanzo have also called Mr. Krasner's non-discriminatory explanations into question by introducing interview statements regarding his approach to personnel decisions as part of their prima facie cases of age discrimination. "[I]f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, [he or] she need not present additional evidence of discrimination beyond her prima facie case to

12

survive summary judgment." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013). This evidence includes Mr. Krasner's statements that "people who are going to be made to leave . . . will tend to be my generation, people who started in this business 30 years ago", Doc. No. 23-8, at 89, and that, in contrast to new prosecutors "coming mid-career or straight out of law school", the "old guard . . . needs to go", *id.* at 97.

The City and Mr. Krasner argue that Mr. Krasner's interview comments are taken out of context, do not relate to Mr. Gilson or Mr. Costanzo at all, and were made "either months before or months after their termination." Doc. No. 28, at 4. First, the City and Mr. Krasner emphasize additional language surrounding Mr. Krasner's "old guard" comments that "distinguishes prosecutors based on philosophy not age." *Id.* at 11–12 ("As I said, I think there is an old guard, *it certainly isn't [] everyone above a certain age, that's not the case [], but [there] is an old guard there*.") (emphasis in original).[2] However, Mr. Gilson and Mr. Costanzo argue that Mr. Krasner specifically identified those "who will be made to leave" as people, like Mr. Gilson and Mr. Costanzo, whose careers as prosecutors began 30 years ago. Doc. No. 27, at 5. It is also undisputed that Mr. Krasner was the person, following a lively political campaign, who made the termination decisions. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1215 (3d Cir. 1995) ("Because discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant . . . ."). Further, it is not clear how the timing of statements made repeatedly before *and*

---

[2] The City and Mr. Krasner also cite a Seventh Circuit case, *Turbergen v. St. Vincent Hosp. & Health Care Ctr.*, 517 F.3d 470, 474 (7th Cir. 2008) for proof that "identifying a group as 'old guard' does not imply that its members are chronologically old." Doc. No. 23-1, at 6. However, the Seventh Circuit in *Turbergen* stated that "the context in which the comment was made makes it even more unlikely that [the employer] was thinking about Tubergen at all, much less his age" because the "old guard" comment was made about a hospital area in which Tubergen did not work. *Id.* at 474. Mr. Gilson and Mr. Costanzo, in contrast, were in fact attorneys in the District Attorney's Office and the City and Mr. Krasner do not dispute that he made these comments about this office.

after the termination decision could help Mr. Krasner's assertion that they were not related to the terminations. As Mr. Krasner and the City are the movants, inferences must be drawn in Mr. Gilson's and Mr. Costanzo's favor. A reasonable jury could credit Mr. Krasner's interview statements as evidence of discriminatory intent in terminating Mr. Gilson's and Mr. Costanzo's employment.[3]

When a court "only has before it dueling narratives" as to the reason for termination of a plaintiff's employment, "a genuine dispute of material fact remains as to pretext." *Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017). The issue of whether Mr. Krasner's proffered reasons for termination of Mr. Gilson's and Mr. Costanzo's employment are mere pretext is a genuine dispute of material fact that precludes summary judgment.

## CONCLUSION

For the foregoing reasons, the Court denies the City and Mr. Krasner's motion for summary judgment with respect to the ADEA and PHRA claims. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[3] Mr. Krasner also argues that his January 5, 2018 terminations included 10 employees under the age of 40, out of a total of 30 terminations, which "nullifies any conceivable inference of age bias" based on Mr. Krasner's public statements. Doc. No. 23-1, at 14. Mr. Gilson and Mr. Costanzo counter that between July 2018 and September 2019, Mr. Krasner hired 138 new attorneys, 127 of whom were under the age of 40. Doc. No. 27, at 7. These competing statistics also create an issue of "dueling narratives." *Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017).